# UNITED STATES DISTRICT COURT
for the
Eastern District of Wisconsin

CLERK'S OFFICE
A TRUE COPY
Mar 26, 2020
s/ Daryl Olszewski
Deputy Clerk, U.S. District Court
Eastern District of Wisconsin

In the Matter of the Search of: )
)
Facebook user: Christopher Jones with a Facebook )
Identification (UID): 100001681482451 ) Case No. 20-MJ-110
and Facebook name of "Chris Palmer-in Chamber" )
)
)

## APPLICATION FOR A SEARCH WARRANT

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property:

See Attachment A

located in the Eastern District of Wisconsin, there is now concealed:

See Attachment B

The basis for the search under Fed. R. Crim P. 41(c) is:
☒ evidence of a crime;
☐ contraband, fruits of crime, or other items illegally possessed;
☐ property designed for use, intended for use, or used in committing a crime;
☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to violations of: 18 U.S.C. §§ 2113(a) and (d) (Armed Bank Robbery) and 1951(a) (Hobbs Act Robbery), and Title 18, United States Code, Section 2113(a) (Attempted Bank Robbery).

The application is based on these facts: See attached affidavit.

☐ Delayed notice of _____ days (give exact ending date if more than 30 days: _____) is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

*Applicant's signature*

Sworn via telephone; delivered via email pursuant to Fed. R. Crim. P. 4.1

~~Sworn to before me and signed in my presence:~~

Matthew Gibson, TFO
*Printed Name and Title*

Date: March 26, 2020

*Judge's signature*

City and State: Milwaukee, Wisconsin       Honorable William E. Duffin, U.S. Magistrate Judge
*Printed Name and Title*



CLERK'S OFFICE
A TRUE COPY
Mar 26, 2020
s/ Daryl Olszewski
Deputy Clerk, U.S. District Court
Eastern District of Wisconsin

# AFFIDAVIT IN SUPPORT OF
# AN APPLICATION FOR A SEARCH WARRANT

I, Matthew Gibson, being first duly sworn, hereby depose and state as follows:

## INTRODUCTION AND AGENT BACKGROUND

1. I make this affidavit in support of an application for a search warrant for information associated with a certain Facebook user ID that is stored at premises owned, maintained, controlled, or operated by Facebook, a social networking company headquartered in Menlo Park, California. The information to be searched is described in the following paragraphs and in Attachment A. This affidavit is made in support of an application for a search warrant under 18 U.S.C. §§ 2703(a), 2703(b)(1)(A) and 2703(c)(1)(A) to require Facebook to disclose to the government records and other information in its possession, pertaining to the subscriber or customer associated with the user ID.

2. I have over 28 years of experience as a law enforcement officer and am currently assigned to the Milwaukee FBI Violent Crime Task Force as a Deputized Federal Task Force Officer. I was a Special Agent with the Federal Bureau of Investigation for over 23 years and have been an Investigator with the Milwaukee County District Attorney's Office since June of 2015. I have participated in numerous complex narcotics, money laundering, violent crime, armed bank robbery, and armed commercial robbery investigations in violation of Title 21, United States Code, Sections 841(a)(1), 843(b) and 846, and Title 18, United States Code, Sections 924(c), 1951, 1956, 1957, 2113, and other related offenses. I have employed a wide variety of investigative techniques in these and other investigations, including but not limited to, the use of informants, wiretaps, cooperating defendants, recorded communications, search warrants, surveillance, interrogations, public records, DNA collection, and traffic stops. I have also received formal training regarding the same. As a Federal Task Force Officer, I am

authorized to investigate violations of laws of the United States and to execute warrants issued under the authority of the United States.

3. During the course of my career, I have had trainings regarding the use of social media in relation to criminal investigations. Specifically, I have received instruction regarding the use of social media sites by criminal elements. Additionally, I have conducted previous criminal investigations in which internet research that I conducted yielded the use of social media by suspects. Specifically, I know from my training and experience that alleged suspects of criminal activity, who have accounts on social media websites, will often communicate their criminal intentions or past activity via "instant message" or "in-box message" on a given social media website. The "instant message" / "in-box message" is a private communication from one user to another. Furthermore, I know through experience that many social media users often use social media websites as their primary means to communicate with others. Additionally, I know from training and experience that suspects who use social media websites sometimes post photographs of themselves possessing incriminating items, such as large amounts of cash, narcotics, and firearms. Also, suspects in criminal investigations have been known to post statements on social websites referencing their own criminal activity.

4. Information contained in this affidavit was either obtained directly by me or by other investigators who I believe to be truthful and credible. The facts in this affidavit come from personal observations, training and experience, and information obtained from other investigators and witnesses.

5. This affidavit is intended to show merely that there is sufficient probable cause for the requested warrant and does not set forth all of my knowledge about this matter.

6. Based on the investigation to date, I believe there is probable cause that

Christopher M. Jones (DOB XX/XX/1995) committed the February 21, 2020 robbery of the PNC Bank, 5216 West Capitol Drive, Milwaukee, WI, in violation of Title 18, United States Code, Sections 2113(a) and (d) (Armed Bank Robbery), the March 6, 2020 attempted robbery of the Wells Fargo Bank, 3323 West Villard Avenue, Milwaukee, WI, in violation of Title 18, United States Code, Section 2113(a) (Attempted Bank Robbery), and the March 6, 2020 attempted robbery of the Community Financial Service Center, 821 East Capitol Drive, Milwaukee, WI, in violation of Title 18, United States Code, Section 1951(a) (Attempted Hobbs Act robbery). Jones is currently on Federal Supervised Release in the Eastern District of Wisconsin for a 2014 bank robbery conviction. Finally, there is probable cause to search the information described in Attachment A for evidence of these crimes, as described in Attachment B.

## IDENTIFICATION OF ITEMS TO BE SEARCHED

10. I seek authorization to search the following Facebook accounts:

| USER | FACEBOOK IDENTIFICATION (UID) | FACEBOOK NAME |
|---|---|---|
| Christopher Jones | 100001681482451 | "Chris Palmer-in Chamber" |
| Daron Carter | 100006067892285 | "Drew Carey" |

## PROBABLE CAUSE

11. On February 21, 2020, at approximately 11:24 a.m., a subject entered the PNC Bank, 5216 West Capitol Drive, Milwaukee, Wisconsin, and approached the victim teller. The subject placed a note and a plastic bag on the teller tray. The subject then demanded, "Put it in the bag." The subject placed his hand into his sweatshirt pocket implying he had a firearm. The

teller read the note which stated words to the effect of, "Put $5,000 in the bag" written in pencil. The subject kept saying, "Hurry up, bro" and "Hurry the fuck up, bro." The subject covered his mouth and lower face with his gloved left hand. The teller placed cash, which included bait money, on the teller tray next to the bag. The subject took the money and then demanded the note back. The subject took the cash, bag, and note and fled the bank. The bank was federally insured at the time of the robbery.

12. Based upon witnesses' descriptions and the PNC Bank surveillance video, the subject was described as a black male, 32-35 years of age, 6'2" tall, 230 pounds, medium build with a medium complexion. The subject was wearing a black knit skullcap, a gray Carhartt brand hooded sweatshirt with the hood up, black pants, black athletic shoes with a white sole, black sunglasses, and black gloves.

13. On March 6, 2020, at approximately 11:07 a.m., a subject entered the Wells Fargo Bank, 3323 West Villard Avenue, Milwaukee, Wisconsin, and went to a teller window. The subject pushed a black plastic bag thru the teller tray and stated, "Give me all the money. I am not playing. I have a gun and will shoot." The subject covered the lower portion of his face with his hand. The two tellers at the teller line both ducked down behind the counter and security barrier. The subject then yelled he wanted them to give him money and that he would start shooting. The subject then robbed a pregnant customer in the lobby of the bank of her wallet after threatening to shoot her. The subject fled the bank and entered a black four-door car with front-end damage. Recovered with black plastic bag was a demand note which read, "I have a gun!!! Put $5,000 in bag. No die pack or else. XXXXX. I will fucking kill." The subject did not obtain any funds from the bank. The bank was federally insured at the time of the attempted robbery.

14. Based upon the surveillance video and witness descriptions, the subject was described as a black male, approximately mid 20's in age, approximately 6'1" – 6'3", approximately 170 pounds, medium build, light complexion, wearing a blue sweatshirt, black pants, black athletic shoes, black gloves, black sun glasses and a blonde and brown shoulder length wig. The blue sweatshirt had a very distinct design on the front. The design is a yellow in color "peace" symbol that has various white dots, orange at the top and blue underneath the "peace" symbol. There also appears to be two white designs the right and left sleeves.

15. On March 6, 2020, at approximately 11:48 a.m., a subject entered the Community Financial Service Center, 821 East Capitol Drive, Milwaukee, WI, approached the teller window, and pushed a customer out of the way. The subject passed a white plastic bag thru the teller tray. The two tellers, who were behind safety glass, ran to safety and activated the alarm. The subject fled the business without obtaining any funds. The Community Financial Service Center was a business involved in interstate commerce at the time of the attempted robbery.

16. Based upon the surveillance video and witness descriptions, the subject was described as a black male, early 20's in age, approximately 5'10" to 6'0" tall, thin build, medium complexion, wearing a blue sweatshirt, black pants, black athletic shoes, black gloves, dark sun glasses and a blonde and brown shoulder length wig. The blue sweatshirt appeared to be the same sweatshirt as described in the Wells Fargo attempted bank robbery, which had occurred approximately 40 minutes earlier.

17. Law enforcement conducted a video canvas in the area of Community Financial Services Center and determined that the subject arrived in a black car and departed in a black car. The vehicle appeared to be a black Ford Taurus with some damage.

18. On March 7, 2020, a fingerprint on the bag recovered in the Community Financial Service Center robbery was identified as Christopher M. Jones' (DOB XX/XX/1995) fingerprint. A criminal history check revealed Jones was on Federal Supervised Release for a previous bank robbery conviction.

19. On March 8, 2020, Jones was arrested following a traffic stop.

20. Investigation determined that Jones had been detained by the Rockton, Illinois Police Department on March 2, 2020 following a high-speed vehicle pursuit and traffic stop. Jones was the front seat passenger in the vehicle, which was described as a 2003 white Infiniti bearing Illinois license plate BQ68432, and VIN JNKCV51E63M026152. The driver was arrested and the vehicle towed. There was also a young child in the car. The plate did not list to the Infiniti. During the stop, Jones stated that he owned the Infiniti and had purchased it a few weeks prior for $2400. Jones stated he did not have a bill of sale nor was the vehicle registered in his name.

21. On March 10, 2020, investigators interviewed Jones's Federal Probation Officer. She stated that Jones was released from the Bureau of Prisons on January 15, 2020, and Jones reported to the Probation Office in the Eastern District of Wisconsin on January 21, 2020. The Probation Officer had office visits with Jones several times and conducted a home visit on January 23, 2020. Jones failed to show up or call for a scheduled March 2, 2020 office visit. Jones did come to the office on March 4, 2020. Jones reported to his Probation Officer that he had been detained following a traffic stop in Rockton, IL, on March 2, 2020. Jones was the passenger in a 2003 white Infiniti. Jones advised that he had purchased the Infiniti for over $2000. The Probation Officer advised that Jones has been unemployed since his release and she had contacted him several times at 414-888-1410.

22. The Probation Officer viewed the surveillance video from the February 21, 2020 PNC Bank robbery. She was unable to identify the subject but stated his build was consistent with that of Jones. She did not recognize any of the clothing worn in the three incidents.

23. On March 11, 2020, an investigator interviewed the previous owner of the 2003 white Infiniti, R.C. R.C. stated that he had placed the car for sale online at Facebook Marketplace. On February 22, 2020, a person using Facebook username "Drew Carey" contacted him to purchase the car and arranged to meet R.C. on the south side of Milwaukee that day. A subject who R.C. identified from a photo array as Jones purchased the car for $2,300 in cash on February 22, 2020. R.C. stated that cash was in various denominations including fifties. R.C. identified a photograph of Daron Carter as being with Jones. R.C. stated that on March 3, 2020, Jones sent him his photograph, his phone number 414-888-1410, and a photograph of Rockton Police Department Sergeant Camacho business card. Jones wanted R.C. to confirm with the Rockton Police Department that Jones was the owner of the 2003 white Infiniti. R.C. provided officers with screen shots of his phone concerning his communication with "Drew Carey" and Jones. A review of the screen shots indicated that Carter's brother, Jones, was the one buying the car.

24. On March 11, 2020, a Milwaukee Police Detective interviewed a witness who has known Jones for several years. The witness was shown a still photograph taken from the March 6, 2020 Wells Fargo attempted robbery surveillance video. The witness positively identified the subject as Jones based on his nose. The witness identified Jones' phone number as 414-888-1410.

25. On March 11, 2020, officers located a black Ford Taurus with front-end damage and other significant damage, which appeared consistent with the vehicle used in the March 6,

2020 attempted robberies. The Ford Taurus was observed in the area where Jones was arrested on March 8, 2020. The vehicle was traffic stopped and the driver, C.B., was arrested for an outstanding warrant. The vehicle was towed as evidence.

26. On March 11, 2020, a Milwaukee Detective conducted an in custody interview of C.B. at the Milwaukee Police Department. The interview was audio and video recorded. C.B. was read her Constitutional Rights which she stated she understood and waived in order to speak with the detective. C.B. identified a photograph of Jones as a friend. She stated Jones had a white Infiniti when they met a couple of weeks earlier. She stated that Jones used her black Ford Taurus since they met. C.B. was shown still photographs taken from the Wells Fargo attempted robbery. C.B. stated that the wig worn by the subject was similar to one of the wigs she had at her residence.

27. Cellular tower locations and toll records were obtained through legal process for Jones' phone number, 414-888-1410. A plot of the various tower locations indicated that at 11:14 a.m. on March 6, 2020, Jones cell phone registered at a tower which provided service to the area of the victim Wells Fargo Bank (robbery occurred at approx. 11:07 a.m.). A plot of the various tower locations indicated that at 11:52 a.m. on March 6, 2020, Jones' cell phone registered at a tower which provided service to the area of the Community Financial Service Center (robbery occurred at approx.. 11:48 a.m.). The plots also indicated that in the morning of March 6, 2020 Jones' phone registered on a tower which provided service to the residence of C.B., who reported she had allowed Jones to use her black Ford Taurus.

28. Jones' Facebook page was identified as "Chris Palmer-in Chamber". A review of the publicly viewable pages associated with the account showed multiple photographs of Jones. In addition, law enforcement observed a photograph posted on the account on January 21, 2020,

showing Jones wearing a pair of black athletic shoes with a stripe. The shoes are consistent with the shoes worn by the subject in the PNC Bank robbery on February 21, 2020.

## FACEBOOK INFORMATION

29. Facebook owns and operates a free-access social networking website of the same name that can be accessed at http://www.facebook.com. Facebook allows its users to establish accounts with Facebook, and users can then use their accounts to share written news, photographs, videos, and other information with other Facebook users, and sometimes with the general public.

30. Facebook asks users to provide basic contact and personal identifying information to Facebook, either during the registration process or thereafter. This information may include the user's full name, birth date, gender, contact e-mail addresses, Facebook passwords, Facebook security questions and answers (for password retrieval), physical address (including city, state, and zip code), telephone numbers, screen names, websites, and other personal identifiers. Facebook also assigns a user identification number to each account.

31. Facebook users may join one or more groups or networks to connect and interact with other users who are members of the same group or network. Facebook assigns a group identification number to each group. A Facebook user can also connect directly with individual Facebook users by sending each user a "Friend Request." If the recipient of a "Friend Request" accepts the request, then the two users will become "Friends" for purposes of Facebook and can exchange communications or view information about each other. Each Facebook user's account includes a list of that user's "Friends" and a "News Feed," which highlights information about the user's "Friends," such as profile changes, upcoming events, and birthdays.

32. Facebook users can select different levels of privacy for the communications and information associated with their Facebook accounts. By adjusting these privacy settings, a Facebook user can make information available only to himself or herself, to particular Facebook users, or to anyone with access to the Internet, including people who are not Facebook users. A Facebook user can also create "lists" of Facebook friends to facilitate the application of these privacy settings. Facebook accounts also include other account settings that users can adjust to control, for example, the types of notifications they receive from Facebook.

33. Facebook users can create profiles that include photographs, lists of personal interests, and other information. Facebook users can also post "status" updates about their whereabouts and actions, as well as links to videos, photographs, articles, and other items available elsewhere on the Internet. Facebook users can also post information about upcoming "events," such as social occasions, by listing the event's time, location, host, and guest list. In addition, Facebook users can "check in" to particular locations or add their geographic locations to their Facebook posts, thereby revealing their geographic locations at particular dates and times. A particular user's profile page also includes a "Wall," which is a space where the user and his or her "Friends" can post messages, attachments, and links that will typically be visible to anyone who can view the user's profile.

34. Facebook allows users to upload photos and videos, which may include any metadata such as location that the user transmitted when s/he uploaded the photo or video. It also provides users the ability to "tag" (i.e., label) other Facebook users in a photo or video. When a user is tagged in a photo or video, he or she receives a notification of the tag and a link to see the photo or video. For Facebook's purposes, the photos and videos associated with a

user's account will include all photos and videos uploaded by that user that have not been deleted, as well as all photos and videos uploaded by any user that have that user tagged in them.

35. Facebook users can exchange private messages on Facebook with other users. These messages, which are similar to e-mail messages, are sent to the recipient's "Inbox" on Facebook, which also stores copies of messages sent by the recipient, as well as other information. Facebook users can also post comments on the Facebook profiles of other users or on their own profiles; such comments are typically associated with a specific posting or item on the profile. In addition, Facebook has a Chat feature that allows users to send and receive instant messages through Facebook. These chat communications are stored in the chat history for the account. Facebook also has a Video Calling feature, and although Facebook does not record the calls themselves, it does keep records of the date of each call.

36. If a Facebook user does not want to interact with another user on Facebook, the first user can "block" the second user from seeing his or her account.

37. Facebook has a "like" feature that allows users to give positive feedback or connect to particular pages. Facebook users can "like" Facebook posts or updates, as well as webpages or content on third-party (*i.e.*, non-Facebook) websites. Facebook users can also become "fans" of particular Facebook pages.

38. Facebook has a search function that enables its users to search Facebook for keywords, usernames, or pages, among other things.

39. Each Facebook account has an activity log, which is a list of the user's posts and other Facebook activities from the inception of the account to the present. The activity log includes stories and photos that the user has been tagged in, as well as connections made through

the account, such as "liking" a Facebook page or adding someone as a friend. The activity log is visible to the user but cannot be viewed by people who visit the user's Facebook page.

40. Facebook Notes is a blogging feature available to Facebook users, and it enables users to write and post notes or personal web logs ("blogs"), or to import their blogs from other services, such as Xanga, LiveJournal, and Blogger.

41. The Facebook Gifts feature allows users to send virtual "gifts" to their friends that appear as icons on the recipient's profile page. Gifts cost money to purchase, and a personalized message can be attached to each gift. Facebook users can also send each other "pokes," which are free and simply result in a notification to the recipient that he or she has been "poked" by the sender.

42. Facebook also has a Marketplace feature, which allows users to post free classified ads. Users can post items for sale, housing, jobs, and other items on the Marketplace.

43. In addition to the applications described above, Facebook also provides its users with access to thousands of other applications ("apps") on the Facebook platform. When a Facebook user accesses or uses one of these applications, an update about that the user's access or use of that application may appear on the user's profile page.

44. Some Facebook pages are affiliated with groups of users, rather than one individual user. Membership in the group is monitored and regulated by the administrator or head of the group, who can invite new members and reject or accept requests by users to enter. Facebook can identify all users who are currently registered to a particular group and can identify the administrator and/or creator of the group. Facebook uses the term "Group Contact Info" to describe the contact information for the group's creator and/or administrator, as well as a PDF of the current status of the group profile page.

45. Facebook uses the term "Neoprint" to describe an expanded view of a given user profile. The "Neoprint" for a given user can include the following information from the user's profile: profile contact information; News Feed information; status updates; links to videos, photographs, articles, and other items; Notes; Wall postings; friend lists, including the friends' Facebook user identification numbers; groups and networks of which the user is a member, including the groups' Facebook group identification numbers; future and past event postings; rejected "Friend" requests; comments; gifts; pokes; tags; and information about the user's access and use of Facebook applications.

46. Facebook also retains Internet Protocol ("IP") logs for a given user ID or IP address. These logs may contain information about the actions taken by the user ID or IP address on Facebook, including information about the type of action, the date and time of the action, and the user ID and IP address associated with the action. For example, if a user views a Facebook profile, that user's IP log would reflect the fact that the user viewed the profile, and would show when and from what IP address the user did so.

47. Social networking providers like Facebook typically retain additional information about their users' accounts, such as information about the length of service (including start date), the types of service utilized, and the means and source of any payments associated with the service (including any credit card or bank account number). In some cases, Facebook users may communicate directly with Facebook about issues relating to their accounts, such as technical problems, billing inquiries, or complaints from other users. Social networking providers like Facebook typically retain records about such communications, including records of contacts between the user and the provider's support services, as well as records of any actions taken by the provider or user as a result of the communications.

48. As explained herein, information stored in connection with a Facebook account may provide crucial evidence of the "who, what, why, when, where, and how" of the criminal conduct under investigation, thus enabling the United States to establish and prove each element or alternatively, to exclude the innocent from further suspicion. In my training and experience, a Facebook user's "Neoprint," IP log, stored electronic communications, and other data retained by Facebook, can indicate who has used or controlled the Facebook account. This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence. For example, profile contact information, private messaging logs, status updates, and tagged photos (and the data associated with the foregoing, such as date and time) may be evidence of who used or controlled the Facebook account at a relevant time. Further, Facebook account activity can show how and when the account was accessed or used. For example, as described herein, Facebook logs the Internet Protocol (IP) addresses from which users access their accounts along with the time and date. By determining the physical location associated with the logged IP addresses, investigators can understand the chronological and geographic context of the account access and use relating to the crime under investigation. Such information allows investigators to understand the geographic and chronological context of Facebook access, use, and events relating to the crime under investigation. Additionally, Facebook builds geo-location into some of its services. Geo-location allows, for example, users to "tag" their location in posts and Facebook "friends" to locate each other. This geographic and timeline information may tend to either inculpate or exculpate the Facebook account owner. Last, Facebook account activity may provide relevant insight into the Facebook account owner's state of mind as it relates to the offense under investigation. For example, information on the Facebook account may indicate the owner's motive and intent to commit a crime (e.g.,

information indicating a plan to commit a crime), or consciousness of guilt (e.g., deleting account information in an effort to conceal evidence from law enforcement).

49. Therefore, the computers of Facebook are likely to contain all the material described above, including stored electronic communications and information concerning subscribers and their use of Facebook, such as account access information, transaction information, and other account information.

## INFORMATION TO BE SEARCHED AND ITEMS TO BE SEIZED

50. I anticipate executing this warrant under the Electronic Communications Privacy Act, in particular 18 U.S.C. §§ 2703(a), 2703(b)(1)(A) and 2703(c)(1)(A), by using the warrant to require Facebook to disclose to the government copies of the records and other information (including the content of communications) particularly described in Section I of Attachment B. Upon receipt of the information described in Section I of Attachment B, government-authorized persons will review that information to locate the items described in Section II of Attachment B.

## CONCLUSION

51. Based on the forgoing, I request that the Court issue the proposed search warrant. This Court has jurisdiction to issue the requested warrant because it is "a court of competent jurisdiction" as defined by 18 U.S.C. § 2711. 18 U.S.C. §§ 2703(a), (b)(1)(A) & (c)(1)(A). Specifically, the Court of the Eastern District of Wisconsin is a district court of the United States that has jurisdiction over the offense(s) being investigated, 18 U.S.C. § 2711(3)(A)(i). Pursuant to 18 U.S.C. § 2703(g), the presence of a law enforcement officer is not required for the service or execution of this warrant.

# ATTACHMENT A

*Property to Be Searched*

This warrant applies to information between January 20, 2020, and the present date associated with the Facebook accounts:

| USER | FACEBOOK IDENTIFICATION (UID) | FACEBOOK NAME |
|---|---|---|
| Christopher Jones | 100001681482451 | "Chris Palmer-in Chamber" |
| Daron Carter | 100006067892285 | "Drew Carey" |

## ATTACHMENT B
## Particular Things to be Seized

**Information to be disclosed by Facebook**

To the extent that the information described in Attachment A is within the possession, custody, or control of Facebook, including any messages, records, files, logs, or information that have been deleted but are still available to Facebook, or have been preserved pursuant to a request made under 18 U.S.C. § 2703(f), Facebook is required to disclose the following information to the government for each user ID listed in Attachment A:

a. All contact and personal identifying information, including: full name, user identification number, birth date, gender, contact e-mail addresses, Facebook passwords, Facebook security questions and answers, physical address (including city, state, and zip code), telephone numbers, screen names, websites, and other personal identifiers.

b. All activity logs for the account and all other documents showing the user's posts and other Facebook activities;

c. All photos uploaded by that user ID and all photos uploaded by any user that have that user tagged in them;

d. All profile information; News Feed information; status updates; links to videos, photographs, articles, and other items; Notes; Wall postings; friend lists, including the friends' Facebook user identification numbers; groups and networks of which the user is a member, including the groups' Facebook group identification numbers; future and past event postings; rejected "Friend" requests; comments; gifts; pokes; tags; and information about the user's access and use of Facebook applications;

e. All other records of communications and messages made or received by the user, including all private messages, chat history, video calling history, and pending "Friend" requests;

f. All "check ins" and other location information;

g. All IP logs, including all records of the IP addresses that logged into the account;

h. All records of the account's usage of the "Like" feature, including all Facebook posts and all non-Facebook webpages and content that the user has "liked";

i. All information about the Facebook pages that the account is or was a "fan" of;

j. All past and present lists of friends created by the account;

k. All records of Facebook searches performed by the account;

l. All audio messages sent by the account and messages received by the account;

m. All video messages sent by the account and to the account;

n. Any and all location data that is recorded by Facebook related to the account

o. All information about the user's access and use of Facebook Marketplace;

p. The types of service utilized by the user;

q. The length of service (including start date) and the means and source of any payments associated with the service (including any credit card or bank account number);

r. All privacy settings and other account settings, including privacy settings for individual Facebook posts and activities, and all records showing which Facebook users have been blocked by the account;

s. All records pertaining to communications between Facebook and any person regarding the user or the user's Facebook account, including contacts with support services and records of actions taken.

**Information to be seized by the government**

All information described above that constitutes fruits, evidence and instrumentalities of violations of 18 U.S.C. §§ 2113(a) and (d) (Armed Bank Robbery) and 1951(a) (Hobbs Act Robbery), since January 20, 2020, to the present, including, for each user ID identified on Attachment A, information pertaining to the following matters:

a. The relevant offense conduct, any preparatory steps taken in furtherance of the scheme, communications between the suspect and others related to the relevant offense conduct in the above-listed crimes, communications related to travel, and communications related to the purchase of the Infiniti or any other property;

b. Photographs of clothing and firearms used during the above-listed crimes.

c. Evidence of preparatory steps taken in furtherance of the robberies.

d. Evidence indicating how and when the Facebook account was accessed or used, to determine the chronological and geographic context of account access, use, and events relating to the crime under investigation and to the Facebook account owner;

e. Evidence indicating the Facebook account owner's state of mind as it relates to the crime under investigation;

f. The identity of the person(s) who created or used the user ID, including records that help reveal the whereabouts of such person(s); and

g. The identity of the person(s) who communicated with the user ID about matters relating to relevant offense conduct of the above-listed crimes, including records that help reveal their whereabouts.